## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 22-CR-00032(TFH)** |
| **CHRISTOPHER LOGSDON,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Christopher Logsdon through his attorney,  Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case.  After carefully reviewing the PSR with Mr. Logsdon, there are no objections. For the reasons set forth herein, Mr. Logsdon requests that this Honorable Court impose a sentence of two years probation,  60 hours of community service and $500 restitution to account for:

1.   His lack of need for incarceration,

2.   His amazing commitment to breaking the cycle of poverty in his
     family circumstances and continued commitment to raising children
     that are not his own,

3.      His long history of a strong work ethic which has allowed him and

his family to be productive members of society and

4.      His lack of preparation or planning prior to January 6, 2021 to be

part of the Capitol breach and his peaceful, non-destructive and

non-violent behavior that day both outside and inside the Capitol

building.

## I.      **Background**

Mr. Logsdon comes before the Court having plead guilty  to count 4 of the

Information  charging him with a violation of Title 40 U.S.C. §5104(e)(2)(G).

The sentencing guidelines do not apply to this Class B misdemeanor offense.

## II.      **Media reports of stolen election**

After the presidential election, Donald Trump (hereinafter "Trump") and his

inner circle began spreading the word that the election was "stolen" from him by

Democrats and others.   https://www.washingtonpost.com/politics/trump-election-

voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.

False claims were made on media sources, as well as by the President himself, that

the election system had been corrupted and that the integrity of the election should

be questioned.

As the January 6th committee hearings show, Donald Trump and his advisers knew that he had in fact lost the election but despite this knowledge they engaged in a massive effort to spread false and fraudulent information to convince huge portions of the U.S. population that fraud had stolen the election from him.  According to Representative Liz Cheney,  Vice Chair of the House Select Committee investigating January 6, "President Trump invested millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President." *See*

https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript.

According to a Washington Post Article from June 13, 2022, many in Trump's inner circle, including  his White House Counsel, informed Trump that there was no basis for overturning the election results but that Trump ignored those voices.  While most of these high profile lawyers and advisers to the President testified to the January 6th committee that they told the President personally the facts about the election results and their discomfort with his claims that the election had been stolen, most did not "correct the public record on the issue or speak out against Trump's false claims." https://www.washingtonpost.com/national-security/2022/06/13/jan-6-committee-hearings-live/  When these government advisors  failed to correct the narrative, it left a huge informational void that was

filled with the likes of conspiracy theorists, online extremists and Trump loyalists willing to manipulate public opinion for their own purposes.  People like Mr. Logsdon stood no chance at truly grasping the gravity or reality of the situation, let alone know what the facts truly were before January 6, 2021.

This Court can only understand why Mr. Logsdon came all the way from Illinois to D.C. to attend the Trump Rally by taking into account the enormous influence the President, the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021.  While consumption of media news is no excuse for bad behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of this country, not just Mr. Logsdon.  The media sets the tenor for how people feel about their rights and freedoms and can also plant notions (often false) of discontent or even outrage. After months of watching our major cities burn, many people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard.  Additionally, because of the widespread belief, which turned out to be true, that very few BLM supporters were being prosecuted for their criminal behavior while violently protesting, the media helped reinforce the notion that there would be little to no consequences for protestor actions. https://www.mauinews.com/opinion/columns/2021/07/heres-why-most-arrested-rioters-will-not-be-prosecuted/;

https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-protests-cover-looting-police-say/5324881002/.  The federal courthouse in Portland, Oregon was literally taken hostage by violent rioters and yet almost half of those cases were dropped and other defendants received the equivalent of a slap on the hand for their participation.  Here in D.C., although hundreds, if not thousands, committed property crimes such as painting federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible.  https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.   Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts which received record high audiences in 2020.  *https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power*.   And the President himself added fuel to the fire by declaring that he was trying to actually protect the democratic process.[1]

Mr. Logsdon, like millions of other Americans, ate up the online and televised media coverage of these events in the Summer of 2020.   He saw the so

---

[1] On January 4th, 2021 at 10:07 a.m. EST Donald Trump tweeted: "How can you certify an election when the numbers being certified are verifiably WRONG. You will see the real numbers tonight during my speech, but especially on JANUARY 6th…" https://www.presidency.ucsb.edu/documents/tweets-january-4-2021 (last visited August 28, 2022).

called "mainstream" media label destructive and violent BLM riots as "mostly peaceful" and the protestors praised on national media outlets for their strongly held beliefs.  And while the majority of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not.  The report suggested that the "disparity stems from political orientation and biased media framing such as disproportionate coverage of violent demonstrations." https://time.com/5886348/report-peaceful-protests/.



Image obtained from video clip at https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

Mr. Logsdon similarly had strongly held beliefs after the Presidential election, mostly influenced by the President's own messaging and propaganda, that there had been irregularities in the election.  He decided to come to D.C. to *peacefully* protest the results of the election and the lack of attention to alleged voting irregularities (emphasis added).   A recent video released by the New York Times  demonstrates that on January 6, there were two types of protestors there in the crowd that day.  https://www.nytimes.com/2022/06/17/us/politics/proud-boys-jan-6.html  There were ones initially who waited outside barricades and peacefully assembled with the intent just to exercise their First Amendment rights and others there with a plan  to incite the crowd and to breach the Capitol building.  The regular folks, like Mr. Logsdon, were referred to by some of the planners, including the Proud Boys, as the "normies."  The "normies" were used as unwitting pawns in the plans of the Proud Boys and others that day.



The plan depended on  creating chaos and whipping up the "normies" into a patriotic frenzy.   The groundwork for this frenzy had been laid in the weeks before January 6th by the Trump propaganda about election fraud and had been fueled by Trump himself at the rally on the mall.  The Proud Boys intended to use the large crowd to distract and overwhelm as they went to work of breaking into the Capitol.

Mr. Logsdon had no idea he was being used as a pawn in a game far more sophisticated and complex than anyone could imagine.    Consider that is has taken the January 6th  House Select Committee more than a 1000 individual interviews

and nearly 2 years  of investigation, to parse through to what they feel is some truth

about what transpired that day.   How could Mr. Logsdon, or any "normie" that

day have known what was to happen?   He came to the Capitol with no intent to do

anything but add his voice to the vocal protests over the injustice he perceived had

happened in the election.   He thought of himself as a witness to this injustice and

the historic protest that day.   Yet he did not suit up for combat.  He did not

obscure his face.  He was not armed.  He wore street clothing.  He did not carry

anything.  He came with his wife, not as part of a group.  Mr. Logsdon committed

no violent actions in his peaceful protest.  He did not destroy anything. His only

desire was to participate in a democratic process that is protected under the First

amendment of our Constitution. Unfortunately, he now understands that going into

the Capitol that day was not part of that legal democratic process, he regrets his

actions.  He now stands before the Court after admitting to the Court at his plea

hearing that he knew going into the Capitol that day was wrong.

### III.   THE TRIP TO THE CAPITOL AND JANUARY 6, 2021

#### A.  Mr. Logsdon's trip to D.C. and his walk to the Capitol

Mr. Logsdon  believed what he read on the internet and heard from the

President himself - that the election had been stolen.   He believed that there was

wrongdoing in the State of Georgia.  He also believed that he should show his

support for the soon to be former President by attending his rally scheduled for

January 6, 2021, at the Ellipse on the Mall.   Importantly, Mr. Logsdon was fixated on the *process,* not the result of the election. The emphasis on the process, and not the result, is particularly important because it shows that Mr. Logsdon values the Constitution and the foundation of our government.  At no time did he ever think he was going to the Capitol, let alone inside the Capitol. Not until Trump's speech did he have any intention of  going anywhere other than the Ellipse area, and not being from the area or having attended a protest there before, had no real sense of where things were in relation to each other.  As the day unfolded, he never planned or  envisioned entering the U.S. Capitol.  That is, *not until Trump invited everyone to march to the Capitol*. Mr. Logsdon and his wife followed the large crowd there that day with no intention of doing anything but having their voices join those of thousands of other peaceful protestors. Now, after seeing what really happened that day by watching film on numerous platforms, Mr. Logsdon regrets going into the Capitol but he had no idea that there was to be so much violence that day.

### B.  **Mr. Logsdon's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know, the Proud Boys instigated a push to overwhelm the few, undertrained, under equipped and unprepared police.[2] Officers were able to hold off the excited crowd

---

[2] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside

for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This was several minutes before Mr. Logsdon followed his wife into the Capitol.  Hundreds preceded him in entering. This breach spurred the evacuation of members of Congress and the Vice President.

Mr. Logsdon  was not in this first wave of hundreds of protesters.   He  and his wife could not see what was transpiring inside the Capitol. He had no idea of the violence in other parts of the Capitol. In fact,  Mr. Logsdon had been so far behind the first people in that he had no idea how the door was opened or who opened it. The confusion at this point lies between conflating *our epistemic access* of the full scope of events in their entirety with *Mr. Logsdon's knowledge and intention* as the day unfolded. That is, though many others were violent, pushing officers, etc., Mr. Logsdon  was not violent, carefully observed the situation around him, and acted with decency (as we will see later).   In fact, once inside the Capitol, Mr. Logsdon spent most of his time in the building looking for a way to get out.  All of the doors they tried to get through were magnetically shut. He finally flagged down an officer and asked how to get out of the building and the officer kindly explained how to get out.  While trying to get out of the building,

---

the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

Mr. Logdson also helped an African American female police captain to her feet who had been accidentally knocked down.[3]

### C. Hindsight is 20/20.

Mr. Logsdon never imagined going inside the Capitol and certainly never thought that violence would follow. He does not condone the violence and did all he could to get himself and his wife out, safely, which he did. Indeed, Mr. Logsdon's aimless following of the crowd through the Capitol that day is evidence of his lack of intent to do something in the Capitol that day, his lack of understanding where he was in the Capitol, and his herd mentality, rather than a desire to break the law. He respected the police officers he encountered and he proceeded out of the building peacefully when shown the way.

### D. The Charges and the arrest of Mr. Logsdon

On January 18, 2022, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Logsdon with four misdemeanor offenses related to his conduct on January 6. *See* ECF No. 1.[4] On February 1, 2022, he was arraigned and put on a PR bond by Magistrate Judge Meriwether. *See* ECF No. 11. According to Mr. Logdson approximately 13 officers stormed his

---

[3] The defense has no video that shows this, but expects that like so many other cases, evidence of it may show up months down the road in another case's discovery dump. This seems to transpire with frequency.

[4] Those four charges are: (i) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iii) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

home in the early morning hours.     While the FBI ransacked his home, he and his

wife willingly spoke to the FBI agents on scene. As is usually the case in these J6

cases, no one read the Logdsons their Miranda rights. Mr. Logdson  later entered a

plea of guilty via video conference before this Honorable Court on July 20, 2022.

*See* ECF No. 39 .

## IV.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain

factors a district court is to consider when sentencing a defendant who has been

convicted of a federal offense.   Primarily, the court shall consider the nature and

circumstances of the offense and the history and characteristics of the defendant.

*See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence

imposed to: reflect the seriousness of the offense, promote respect for the law, and

provide just punishment; afford adequate deterrence to criminal conduct; protect

the public from further crimes of the defendant; and provide defendant with needed

educational or vocational training, medical care, or other correctional treatment in

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision:

1.    The nature and circumstances of the offense and the history and characteristics
      of the defendant;
2.    The need for the sentence imposed;
3.    The kinds of sentences available;
4.    The kinds of sentence and the sentencing range…;
5.     Any pertinent policy statements issued by the Sentencing Commission;

6.    The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

7.    The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).   *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A.      Nature & circumstances of the Offense & the History and Characteristics of Mr. Logsdon

First, the defense is not aware of any evidence that defendant's entry into the Capitol was violent in any way.  Second,  Mr. Logdson did not engage with others while parading in the Capitol.  For example, he didn't chant "whose house, our house" or "USA, USA" like literally thousands of other protesters.  Third, there is no evidence that he engaged in any violence or questionable conduct towards law enforcement. Fourth, the defense is not aware of any evidence that he destroyed or stole any property from the Capitol. Fifth, based on the Government's investigation, it appears that he remained in the Capitol building for a limited period of time.  The defense is not aware of any evidence that he entered the Senate or House Chamber.

The government must concede that he committed no violent acts and destroyed no property. His actions within the Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property, steal property or commit violent acts. He entered and exited through doors. And when he spoke to police officers, it was non-confrontational and respectful.  He did not suit up for combat.  He did not obscure his face.  He was not armed.  He did not yell at anyone. He wore street clothes.  He committed no violent actions during her time inside and outside the Capitol.  He did not destroy anything.

To his credit, Mr. Logsdon  spoke to the officers and  FBI freely when he was arrested (as did his wife).  He fully acknowledged  his misconduct by answering pointed questions by multiple FBI agents, he  expressed true and full contrition.  He was relieved by the opportunity to take responsibility for his actions.  He has not one time had any violations of his conditions of release.    He did not post anything on social media or brag to friends. By the time Mr. Logsdon at the U.S. Capitol after 2:00 p.m., many of the barriers that had been erected along the perimeter of the building were no longer present. Mr. Logsdon met no

resistance in his walk to and inside the Capitol. At the time,  Mr. Logsdon didn't

dream he'd be charged for going into the Capitol.[5]

This has been a tough road for Mr. and Mrs. Logsdon. Mr. Logsdon has a very

simple life: he works hard and provides for his family. He has a very limited criminal

history, which looks worse than it actually is and it's very old-more than 10 years

old. His battery charge was from a dispute with  his wife's ex-husband. His personal

history is very, very sad. His opportunities for getting ahead in life were very, very

limited by the poverty and abuse that so often afflicts children, especially in the area

of Illinois where he grew up.[6] And yet, he managed to find a good job and excels at

it. He's not missed a day of work in 13 years. He pled guilty at an early stage in the

proceedings thus saving valuable judicial resources. It is of utmost importance to

Mr. Logdson that this Court understand that he is incredibly remorseful for his

actions on January 6, 2021.  None of his actions will be erased from the internet. It's

there forever.  He has fully accepted responsibility for his bad judgement in entering

the Capitol building.   He has been the subject of a number of media accounts

lumping him with others that were there on January 6, 2021 for violent purposes.

His personal character and reputation will forever be tarnished.

---

[5] Notably, the Department of Justice has declined to bring criminal charges against the speakers or organizers of the rally; the only legal actions initiated against them being civil in nature. *See Thompson et. al., v. Trump et. al.*, 21-cv-00400, ECF No. 1 (Feb. 16, 2021); *Swalwell v. Trump et. al.,* 21-cv-00586, ECF No. 1 (Mar. 5, 2021); *Smith et. al. v. Trump et. al.,* 21-cv-02265, ECF No. 1 (Aug. 26, 2021). .

[6] Undersigned counsel grew up in a small Norwegian farm town approximately 20 minutes from where Mr. Logdson grew up and is acutely aware of the economic  hardships children in this area face. Because there was no community safety net, Mr. Logsdon struggled  for years but got his GED. It's remarkable that he's done so well.

Mr. Logdson does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm and intended no harm.   His recent past behavior and his post arrest behavior show that he is capable of being a very productive citizen and the Court can rely on that as a basis to sentence  him  to a term of probation considering the 3553 factors.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already been severely punished as noted *supra*.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political

posturing.  A sentence of  probation does constitute punishment  and  it will deter

others as one's liberty interests are curtailed by travel restrictions, reporting

obligations, and limitations on one's personal freedoms. He has been on pretrial

release for nearly a year  with many restrictions.  The National Institute of Justice,

Department of Justice, issued a summary of the current state of empirical research

stating that "prison sentences are unlikely to deter future crime," and "increasing

the severity of punishment does little to deter crime."  U.S. Dep't of Justice, Office

of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence*

(July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*,

42 Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2.  Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Logdson's  likelihood of recidivism is really non-existent. He has

expressed genuine remorse and contrition, and  accepted the first plea offer

tendered with no hesitation. His acceptance of responsibility was complete and

without reservation.  Research has consistently shown that while the certainty of

being caught and punished has a deterrent effect, "increases in severity of

punishments do not yield significant (if any) marginal deterrent effects." Michael

Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)"

Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given Logsdon's  current age  and other issues consistent with what is mentioned above, the likelihood that he would ever re-offend is as close to zero as one might come. A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice.  The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice.  Mr. Logdson urges the Court to impose a sentence of probation in  this case in light of his family obligations, his sincere and complete remorse,

his non-violent conduct at the Capitol, and his early and consistent acceptance of responsibility, and the lack of a need to further deter him.

## C. The kinds of sentences available

The sentencing guidelines do not  apply  in this case.  A sentence of additional incarceration would result in sentencing disparity with other individuals who were similarly charged and behaved similarly. *See infra*.[7]

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is modest as outlined in the PSR and he respectfully submits that he cannot pay any significant fine.  His salary was just recently increased.  Considering the value of their home, the fact that there is an outstanding mortgage, and that they have a minor child that they hope to send to college, counsel respectfully disagrees with the probation officer that a fine is warranted. *See* PSR, paragraph 73.   If the Court is inclined to order a fine, a small amount such as $500 would be  respectfully requested.

## D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than probation, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court.  The following cases are a sampling where a class B misdemeanor was charged and pled

---

[7] This does not include every case, just a sampling.

to and resulted in no incarceration with facts that often were more egregious than

Mr. Logdson's:

**United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to probation);
**United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to probation even though she entered through a broken window and yelled at police officers);
**United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to probation);
**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. *See United States v. Jessica and Joshua Bustle*, 21-00238 (TFH). This Court imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle. The government recommended probation in this case.
**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three months home confinement and two years' probation). According to the government, who recommended probation with a short term of home confinement*, Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.

None of this is to suggest that Mr. Bennett should have received a sentence of incarceration, only to suggest that the distinctions the government draws are hard to justify.

This Court has more recently sentenced defendants to short sentences of incarceration in cases where again, the individual conduct was more severe than Mr. Logsdon's.  Comparatively,  Mr. Logsdon's conduct would not justify a sentence of incarceration and such disparate treatment. The courts have sentenced some January 6 misdemeanor cases to incarceration, but the nature and circumstances of those offenses, as well as the history and characteristics of the defendants in those cases, can be distinguished.  For example, in *United States v. Weisbecker*, 21 CR 682(TFH) this Court ordered 30 days of intermittent confinement as a condition of 24 months' probation. As the Court will recall, Mr. Weisbecker's conduct and treatment towards law enforcement was much more severe than the instant case. He entered the Speaker's suite of offices, he posted multiple videos and photos on Facebook and other media cites, and berated federal border patrol officer at checkpoints multiple times.

In *United States. v. Baker*, 21 CR 273(TFH), this Court sentenced the defendant to 9 days intermittent incarceration "when he chose to remain in the Capitol despite watching police attempt to expel rioters from the building", ECF #34, p.2, he live streamed the event and also dictated what was happening in real

time and staying in the building even though police told the crowd to leave the Rotunda. These are factors more aggravating than that of Mr. Logdson.

In *United States v. Carlton*, 21 CR 247 (TFH), this Court sentenced the defendant to 36 months' probation. Mr. Carlton was a prison guard, and his conduct was much more egregious than Mr. Logsdon's. As the government pointed out in their sentence memo, Mr. Carlton: (1) made two separate entries into the Capitol; (2) chose to enter the Capitol Building after watching rioters climb the scaffolding, smelling tear gas, and seeing billows of smoke rise around him and from the Lower West Terrace, where rioters were clashing with law enforcement; (3) initially lied to law enforcement officials about his activity on January 6, 2021; (4) admitted he "may have" deleted some texts related to January 6; (5) filmed the chaos around him rather than choosing to leave; (6) has not expressed since remorse for his crimes on January 6, and (7) as a corrections officer, Carlton should have recognized the dangers that he and his fellow rioters' presence at the Capitol posed to public safety. *See  Gov't sent. Memo,* ECF No. 47, p. 2. Mr. Logsdon engaged in none of this conduct.

In *United States v. Youngers*, 21 CR 640 (TFH) this Court again gave a probationary sentence despite that defendant's conduct as outlined by the government:

Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol Building, filmed a confrontation between rioters and police, and entered through

the Senate Wing Door within ten minutes of the initial breach. After filming himself declaring "this is what a revolution motherfucking looks like," and collecting a souvenir piece of broken glass, he and codefendant George Tenney proceeded to the Rotunda Doors, which had not yet been breached. Tenney opened the door for rioters, instigating the breach of the Capitol from the east side. Youngers tried to open one of the doors too, encouraged entering rioters, and swatted at a police officer, but then took some steps to assist the now-outnumbered police, untangling an officer's radio from a bench and temporarily keeping some rioters away from that officer. Before leaving the area, Youngers filmed another video celebrating the breach of the Capitol. Back at a hotel, he filmed a video denying that there was violence at the Capitol and gave an interview wearing a full-face mask to conceal his identity.

*See* ECF No. 55, Gov't sent. memo at p. 2.

All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mr. Logdson's conduct and characteristics. His actions fall on the low-end of the spectrum that day and his culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.  While Mr. Logsdon accepts responsibility for his actions, he was guided and urged every step of the way by no less of an authority than the former President of the United States and a majority of Republican Senators and Congressman that continued to repeat the 'Big Lie' that the election had been stolen by the Democrats. Mr. Logsdon was a  supporter of the former president. While Mr. Logdson did enter the Capitol, he did so with his wife.

This Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; *through a door after many others had breached the Capitol* (2) whether the defendant encouraged violence; *absolutely not.* (3) whether the defendant encouraged property destruction; *none* (4) the defendant's reaction to acts of violence or destruction; *he tried to get out of the Capitol and away from violence* (5) whether during or after the riot, the defendant destroyed evidence; *none* (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; *not far and about 30 minutes*; (7) the defendant's statements in person or on social media; *none on social media, sparse in person* (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; *cooperated at the Capitol and at his home* (9) whether the defendant demonstrated sincere remorse or contrition; and the defendant's conduct after January 6, 2021. *Yes, he has demonstrated remorse. See* attached letter from Mr. Logsdon, Exhibit 1, to be filed October 24. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

## VI. CONCLUSION

Considering all the applicable factors the Court will consider, Mr. Logdson respectfully moves this court to impose a sentence of 24 months probation, 60

hours of community service,  and $500 restitution.[8]   This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Logsdon as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,

By:   _____/s/_____
          Kira Anne West
          DC Bar No. 993523
          712 H. St. N.E., Unit #509
          Washington, D.C. 20005
          Phone: 202-236-2042
          kiraannewest@gmail.com

CERTIFICATE OF SERVICE

I hereby certify on the 21st  day of October, 2022 a copy of same was delivered to the parties of record, by email  pursuant to the Covid standing order and the  rules of the Clerk of Court.

                             _____/S/___
                          Kira Anne West

---

[8] Mr. Logdson tried to pay the fine before sentencing but counsel was told he could not pay a fine until after sentencing.